DECISION
Plaintiff appeals the denial of its application for property tax exemption for property identified as Accounts 00599775 and 00599784 (subject property) for the 2010-11 tax year. A telephone trial was held on May 3, 2011. Justin C. Jones, Attorney at Law, appeared on behalf of Plaintiff. Witnesses testifying on behalf of Plaintiff included: Marlin Marsh (Marsh), Master/President of Plaintiff since 2009; Dan O'Dell (O'Dell), Chairman of the Park Committee; Les Otto (Otto), Boring Community Planning Organization; Cheryl McGinnis (McGinnis), Executive Director, Clackamas River Basin Council (CRBC); Rebecca Walker (Walker), CRBC; and Ed Lutrell (Lutrell), National Grange President since 2007. Amanda Olsen (Olsen), Assessment Taxation Clerk II, appeared and testified on behalf of Defendant. Linda Dunn (Dunn), Assessment Taxation Supervisor, testified on behalf of Defendant. Plaintiffs Exhibits 1 through 15 and Defendant's Exhibit A were admitted without objection.
 I. STATEMENT OF FACTS
Olsen testified that Plaintiff timely filed an exemption application on March 31, 2010, requesting exemption for three tax lots. Defendant granted exemption for one of the three tax lots (400) in 2008 and it has remained exempt since that time. Defendant denied exemption for the remaining two tax lots (600 and 601), the subject property. *Page 2 
A. Subject property
Marsh testified that the subject property was donated to Plaintiff through the parks group to be utilized in support of community events, for overflow parking, and for use in conjunction with local trails. The subject property is located south of Highway 212, adjacent to Richey Road, and southeast of the Grange Hall; the North Fork of Deep Creek runs through the subject property, cutting between the two tax lots. (See Ptf's Ex 8.) The total size of the subject property is 3.15 acres. (Id. at 2.) Marsh testified that the subject property is located at the Boring Station Trailhead; it lies between the terminus of the Springwater Corridor trail at Dee Street and the Cazadero trail, which is currently under construction. (Seealso Ptf's Exs 8, 9.) Marsh testified that the Cazadero trail runs adjacent to the subject property. O'Dell testified that, at the time the subject property was acquired by Plaintiff, it was very overgrown.
Marsh and O'Dell both testified that the subject property features a paved area that is used for parking. Marsh testified that there is a cyclone fence and gate with a chain and broken lock surrounding the property; the broken lock is maintained to deter illegal dumping. Marsh testified that Plaintiff has never charged for parking; the lot is open 365 days a year. He noted that a sign on the gate states "Trail and Community Event Parking." (See Def's Ex A at 2.)
Olsen visited the subject property on June 30, 2010, as her third inspection, and took pictures. (See Def's Ex A). Olsen testified that her observation of the subject property was that it was "overgrown, mushy grass, with garbage" and that the land is unbuildable. She did not think that it met the requirements for exemption under ORS 307.136. She observed a gate that appeared to be locked, but did not try to remove the lock, explaining that she was "not going to try to tug or open that lock." She was able to gain access to the property and walk around, but only on the paved area because the subject property was too overgrown; she was not able to visit *Page 3 
the stream. She stated that weeds on the subject property surrounding the paved area were "too high for [her] to even walk through in June of 2010." Olsen testified that she does not think the subject property is being used for parking. She testified that she had not seen the subject property prior to its donation to Plaintiff.
Dunn testified that she visited the subject property in September 2009. She observed, at that time, that the gate appeared to be locked, but was able to gain entry to the subject property. She observed that the asphalt slab, approximately one quarter acre in size, was old and cracked, weeds were growing up through the asphalt, and there was trash and an old tire on the asphalt. Dunn observed grass about knee-high and "brambles and shrubs" on the bank of the stream. She did not go down to the stream because it was steep and appeared unstable. She stated that "it looked like there might have been someone in there at some point trying to clean up but there was still some debris." She observed what may have been small alder trees planted near the stream. She testified that the grass away from the stream was very high and the ground was soggy; she did not see any obvious sign of regular use or maintenance of the subject property.
B. Plaintiff's purpose and the National Grange purpose
Plaintiff is organized as a nonprofit corporation. (Ptf's Ex 1, 3.) Marsh testified that Plaintiff is a "family, fraternal, community service type organization" with agricultural roots that promotes a "rural quality of life." Plaintiff's activities focus on promoting stronger communities and environmental stewardship. The Handbook for Grange Masters includes the following statement: "We promote a rural quality of life, and encourage community activities through involvement. We are the voice of our community and country regarding education, agriculture, and environment." (Ptf's Ex 5 at 2.) O'Dell testified that the restoration events with the CRBC further Plaintiff's mission of community involvement and environmental stewardship. *Page 4 
Lutrell testified that Marsh's characterization of Plaintiff's mission was accurate and applies to every Grange organization. He added that "the Grange is primarily designed to help its members grow as people and leaders and reach their full potential and serve their communities."[1] Lutrell testified that the activities on the subject property and the partnership with the CRBC fit within the mission of the Grange, which includes being a good steward of the land. Additionally, the activities are for the benefit of the community. Lutrell testified concerning other Grange projects similar to Plaintiff's activities at the subject property: a Grange in Richland operates a park for the benefit of the local community; a Grange in Pennsylvania operates a park and swimming pool area; many other Granges operate properties used as fairgrounds part of the year and park or recreational areas during the remainder of the year. He testified that it is very typical for Granges to get involved with park-type properties.
Marsh testified that Plaintiff's Park Committee was formed in 2006 with a mission statement adopted in 2008 and revised in March 2010. (See Ptf's Ex 6, 7 at 1.) Marsh testified that the original purpose of the Park Committee was to "bring the community together to develop the future * * * Boring Station Trailhead Park," which is operated by Clackamas County Parks. Marsh testified that the purpose has evolved to include improving the subject property. O'Dell testified that the current purpose of the Park Committee is to "educate the community on community projects, community building, to encourage the development of the park in Boring, and utilize the donated property to help with those goals."
C. Actual and intended uses of the subject property
Marsh and Otto testified that the ultimate goal for the subject property is to be used in conjunction with the eventual connection of the Cazadero trail, the Springwater Trail, and the *Page 5 
Boring Station Trailhead Park; the subject property is to be used for additional parking as well as other educational activities and community events. (See also Ptf's Ex 13 at 1.) Early in 2011, conditional use permits were granted allowing the creation of the Boring Station Trailhead Park. (Ptf's Ex 9.) Marsh testified that the Boring Station Trailhead Park will be immediately north of the subject property, between the terminus of the Springwater Trail at Dee Street and Highway 212. (See Ptf's Ex 8.) Marsh testified that the subject property is adjacent to the connection of the Boring Station Trailhead Park and the Cazadero trail; it provides additional parking.
O'Dell estimated that 30 to 40 cars could fit in the paved area north of the stream and another 30 to 40 cars could fit in the area south of the stream that will be developed. O'Dell testified that the grassy area is also currently used for overflow parking; he testified that he has personally parked there and that it was used during the "Celebration in Boring" event. He testified that the area around the paved area is not suitable for parking and there are no plans to develop that area for parking. Dunn stated that if the paved area "is considered a parking lot and it is indeed available to the public it's possible that that particular piece of the property may qualify for property tax exemption but I still have my doubts about the balance of the property."
O'Dell testified that the ultimate goal is to clean up the entirety of the subject property, but it will take awhile because it is a large property and the project is reliant upon volunteers. He testified that volunteers visited the subject property during the summer of 2010 and cleaned up garbage that had previously been removed from the stream. Otto testified that there has been significant community involvement in cleaning up the subject property; clean-up events are discussed at monthly Park Committee community meetings, on the Park Committee website, and via an email list with over 300 community members. Otto testified that Boy Scout groups, *Page 6 
churches, and children from the local school district have all participated in clean-up and stream restoration events at the subject property. He testified that the clean-up efforts have improved the subject property.
O'Dell testified that he organizes events and activities, including the annual festival "Celebration in Boring" which is held on the property north of Highway 212, which will become the Boring Station Trailhead Park. He testified that that event draws 2,000 to 3,000 visitors and encourages a sense of community in Boring; many clubs, churches, and other organizations participate by setting up informational booths and arranging children's games. O'Dell testified that the subject property is utilized as overflow parking for that event. He testified that the subject property has been used as parking for other events hosted by Plaintiff and by Metro, and has been offered to Guide Dogs for the Blind. (See Ptf's Ex 10.)
O'Dell testified that the CRBC has held several stream restoration events on the subject property over the past few years. Restoration activities with the CRBC began in 2008, including events "with volunteer work party attendance including between 20-50 community and regional volunteers at each work party." (Ptf's Ex 15-A; see also Ptf's Ex 11.) Walker testified that she "facilitated volunteer work parties at the property in November and December of 2009 as well as February 2010 and February 2011." (See id.) Walker testified that the February events, named "A Valentine for the Clackamas," featured games, educational booths, and a potluck after the work party. (See also Ptf's Ex 12.) The CRBC has identified at least six different groups that have volunteered at the subject property. (Ptf's Ex 15-A.) Walker testified that, to date, 79 different volunteers have worked at the site and the CRBC has tracked over 400 volunteer hours. She testified that she has received comments from attendees that they enjoyed the events. *Page 7 
Walker testified that she has been "involved with students who were doing water quality monitoring at the property" and that she has "done water quality monitoring and macro-invertebrate sampling, which are stream insects, at the property." She testified that an eighth grade student from a nearby environmental science school completed a water quality-monitoring project at the subject property and students from Portland State University's Snapshot Water Quality Monitoring program have been monitoring water quality at the subject property since 2009. (See Ptf's Ex 15-A.) She testified that the CRBC has plans for students and volunteers to continue restoration and monitoring activities at the subject property in the summer of 2011.
McGinnis testified that the CRBC's specific interest in the subject property is the North Fork of Deep Creek flowing through the subject property. She testified that the subject property is an area of high-interest for "opening up fish passage barriers, improving water quality for advancing the Oregon plan salmon recovery efforts," improving the over-story, and reducing water temperature. McGinnis testified that work on the property has included removing English Ivy and Himalayan Blackberry. (See Ptf's Ex 15-A.) She is personally familiar with a 300 foot stretch of stream area within a 35 foot buffer; there was a "carpet of ivy" and blackberry that has been pulled.[2] McGinnis testified that removal efforts take a long time, especially because manual removal techniques, rather than pesticides, are employed. She testified that restoration efforts have made a difference; last fall, a large coho was observed downstream of the clean-up site. McGinnis testified that a wastewater facility treatment weir was removed, thereby increasing water flow and reducing stream temperatures, which improved fish habitat. *Page 8 
O'Dell testified that Plaintiff has a signed a "memorandum of understanding" with the CRBC whereby Plaintiff has agreed to allow the CRBC to use the subject property as a model project for stream restoration. "In the latter part of 2010, [CRBC] signed an agreement with [Plaintiff] that designates this site as a model project for stream restoration. The project covers both sides of the creek and involves the majority of the property, and will demonstrate invasive species removal techniques and sample native plants landowners can utilize on their own properties." (Ptf's Ex 15-A.) Walker testified that the area of interest to the CRBC is the stream itself and a 50 foot butter along each side of the stream; on the north side of the stream, the buffer includes the area 50 feet from the stream; on the south side of the stream, the buffer portion along the stream is reduced to 35 feet in the vicinity of the paved parking area. All of the trees planted by the CRBC and volunteer work parties were planted within the buffer zone. Walker testified that the trees planted are smaller and might be less noticeable for that reason.
O'Dell testified that, during Summer 2010, there was a major clean up event at the subject property; dumpsters were donated, he brought in his tractor, and garbage was removed from the stream and the subject property. He testified that upcoming stream restoration events with CRBC will likely be held in June 2011 and during the fall of 2011. Marsh testified that the subject property is not for sale and Plaintiff has no plans to offer it for sale.
In addition to the testimony at trial, Plaintiff provided numerous letters from community members and organizations describing their participation in clean-up and restoration events at the subject property as well as their personal use of the subject property for trailhead parking or their observations of others use of the subject property for trailhead parking. (Ptf's Ex 15-C through 15-K.) *Page 9 
 II. ANALYSIS
Upon compliance with certain application requirements, ORS 307.136[3] allows an exemption for "the following property owned * * * by fraternal organizations":
 "(1) All the real or personal property, or portion thereof, which is actually occupied or used in fraternal or lodge work or for entertainment and recreational purposes by one or more fraternal organizations * * *.
 "(2) Parking lots used for parking or any other use as long as that parking or other use is permitted without charge for no fewer than 355 days during the year."
There is no contention in this case that Plaintiff failed to comply with the application requirements described in ORS 307.162 or that Plaintiff is not a "fraternal organization." The sole issue before the court is whether the subject property was "actually occupied or used in fraternal or lodge work or for entertainment and recreational purposes."
The court is guided by the principle that "[t]axation is the rule and exemption from taxation is the exception." Dove LewisMem. Emer. Vet. Clinic v. Dept. of Rev.,301 Or 423, 426, 723 P2d 320 (1986). Property tax exemption statutes are strictly but reasonably construed. SW OregonPub. Def. Services v. Dept. of Rev.,312 Or 82, 88-89, 817 P2d 1292 (1991). "Strict but reasonable construction does not require the court to give the narrowest possible meaning to an exemption statute. Rather, it requires an exemption statute be construed reasonably, giving due consideration to the ordinary meaning of the words of the statute and the legislative intent." North Harbour Corp. v. Dept. of Rev.16 OTR 91, 95 (2002). Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." Feves v. Dept. ofRevenue, 4 OTR 302, 312 (1971). *Page 10 
A. ORS 307.136 and similar exemption statutes
This court has construed the "actually occupied or used" requirement of ORS 307.136 in only a few cases. This court has twice addressed the similarities and differences between ORS 307.136 and ORS 307.130, which exempts from taxation certain property of charitable and other institutions. In DisabledAmerican Veterans v. Dept. of Rev., 9 OTR 205, 207-08 (1982), this court noted that "`[t]he phrase "exclusively used" [in ORS 307.130] has reference to the primary and incidental use. (Citations omitted.) It is the primary as distinguished from an incidental use that determines whether it is exempt from taxation.'"Id. citing Mult. School of Bible v. Mult. Co.,218 Or 19, 29, 343 P2d 893, 898 (1959). The court observed that ORS 307.136 includes broader language than ORS 307.130 and does not require a "primary use" test:
 "The broader wording of ORS 307.136 must be kept in mind. ORS 307.130 requires that the property of a charitable institution be actually and exclusively occupied or used in the work of the institution. As far as fraternal organizations are concerned, the legislature has failed to include the requirement of `exclusiveness' and has provided that `entertainment or recreation' are exempt activities. The Oregon Supreme Court recognized, in deciding Mult. School of Bible v. Mult. Co., supra, that `actual occupation' is not as strict a limitation of activity as `actual and exclusive occupation.' It is possible that a fraternal organization could actually use or occupy property for fraternal works, recreation or entertainment without using it `exclusively' or `primarily' for those purposes."
Id. at 208 (emphasis in original). Similarly, the court inPerkins v. Dept. of Rev (Perkins), 15 OTR 381, 385 (2001), stated: "The wording of ORS 307.136 is very similar to [that in ORS 307.130] * * * except for the use of `exclusively,' a condition not imposed upon fraternal organizations."
The "use" requirement in ORS 307.140, providing an exemption for certain property of religious organizations, has long been analyzed in the same manner as the "actually used and occupied" standard in ORS 307.130. See German Apost. Christ. Church v. Dept. ofRev., *Page 11 279 Or 637, 641-42, 569 P2d 596 (1977). Accordingly, the court considers case law construing all three exemption statutes, ORS 307.136, ORS 307.130, and ORS 307.140, keeping in mind that ORS 307.136 does not include a requirement of "exclusive" or "primary" use.
B. Actual occupancy and use — case law
Other than the 2,000 square foot paved area, the subject property is comprised primarily of undeveloped land. Additionally, the testimony indicates that large portions of the subject property are not currently used because those portions are forested or otherwise overgrown. Active use of the subject property is confined to the 2,000 square foot paved area, another grassy area with capacity for 30 to 40 cars, and the stream along with a 35 to 50 foot buffer on each side of the stream. Marsh and Otto both testified that Plaintiff's ultimate plan for the subject property is to clean it up and use it in conjunction with other local trails and parks. Plaintiff does not plan to further develop the subject property, but to leave the balance of the subject property in its natural state with the exception of the areas to be used for trailhead parking. Thus, the court looks to exemption case law involving both undeveloped land and partially unused properties.
1. Oregon Supreme Court Cases
In 1986, the Oregon Supreme Court issued two opinions involving large tracts of undeveloped land owned by religious organizations. In Golden Writ of God v. Dept. of Rev. (Golden Writ),300 Or 479, 713 P2d 605 (1986), the Oregon Supreme Court declined to allow a property tax exemption for a 230-acre parcel of farmland.Id. at 487. The taxpayer characterized the property as a "church-school-farm," and described the use as follows: "[t]he entire property is used spiritually, educationally and physically, by and with the horses which have the spirit of *Page 12 
God's Gallantry in them and are used to carry the congregation on the spiritual pathways back into oneness with God."Id. at 482. The Court articulated the standard:
 "To qualify the entire parcel for exemption under ORS 307.140, the taxpayer must actually use the entire parcel primarily for qualifying activities. The criterion is met when the entire parcel is actually used primarily for qualifying activities or when those portions not actually used are reasonably necessary to accommodate the actual qualifying uses that occur on the remainder of the parcel."
Id. at 484.
In Foundation of Human Understanding v. Dept. of Rev.
(Foundation), 301 Or 254, 266, 722 P2d 1 (1986), the Court allowed a property tax exemption for 45.20 acres described as:
 "`A park-like sanctuary for spiritual and work therapy; a retreat for those who need to withdraw temporarily from the horrors of stress and family strife while they study, receive instruction, learn how to meditate and receive the benefits of both spiritual and work therapy. * * * [F]ields and forest, are all used for the religious atmosphere necessary to dispel stress and to bring the retreats [sic] closer to God.'"
The Court concluded that "[t]here is evidence that meditation and individual private spiritual examination in a rural environment are religious activities of the [taxpayer]." Id. The Court denied exemption for the remaining portion of the 327.45-acre ranch because that portion was specially assessed for forest land, which necessarily involved use that the court found inconsistent with the requirements for exemption under ORS 307.140.Id. at 265-66.
A line of Oregon Supreme Court cases address, at least indirectly, "whether and to what extent nonoccupancy and nonuse qualify an organization for an exemption[.]" Woman's ConvalescentHome v. Dept. of Rev., 9 OTR 190, 194 n 3 (1982). The Court allowed a property tax exemption under ORS 307.130 for four parcels of land on which university student housing was under construction and a fifth parcel was used for free parking in conjunction with the other *Page 13 
parcels. Willamette Univ. v. State Tax Com.,245 Or 342, 344, 349, 422 P2d 260 (1966). In a subsequent case, the Court denied a property tax exemption under ORS 307.130 for land that was "vacant awaiting future use, but no construction had begun[,]" explaining that "land merely being held for future use is not being actually occupied or used for the benevolent or charitable work carried on by [the taxpayer]."Eman. Luth. Char. Bd. v. Dept. of Rev.,263 Or 287, 289, 292, 502 P2d 251 (1972). Finally, the Court allowed a property tax exemption under ORS 307.130 where it found that the taxpayer "had a completed building and initiated its occupancy thereof * * * and continued thereafter to expand and develop its use of the building as rapidly as possible[.]" Soc. St. Vin.DePaul v. Dept. of Rev., 272 Or 360, 365, 537 P2d 69 (1975).
2. Oregon Tax Court Cases — exemption granted
This court has, in numerous cases, allowed property tax exemptions for vacant or undeveloped land. In Moshe Wilhelm/Chabad Lubavitchof Oregon v. Dept. of Rev. (Moshe), TC No 3809, WL 604456 at *1, *2 (Oct 12, 1995), the court granted a property tax exemption for "a one-acre parcel of vacant land adjacent to the [taxpayer's religious] school" that was used as a playground area and also in conjunction with classes. The taxpayer testified that it intended "to improve the property over time; however, its resources [were] limited to volunteers and donations." Id. at *1. The court accepted that the taxpayer "intend[ed] to preserve the largely natural environment of the property as a nature laboratory for the students." Id. at *2.
In Church of the Brethren v. Coos County Assessor, TC-MD No 990512D, WL 33117384 at *3 (Dec 17, 1999), the court granted a property tax exemption to 158.89 acres of property described as "undeveloped `timbered land'" used as a church camp. "[T]he `timbered portion of *Page 14 
the property' is used by camp attendees, who are interested in `connecting biblical teaching with environmental issues' and participate in `silent retreats.' There are no posted signs prohibiting camp attendees from walking off the trails. However, the terrain is steep and wooded and while some stray off the trail, many do not." Id. at *2. Applying the Golden Writ standard, the court concluded that the undeveloped portion of the property was "integral to the Camp and reasonably necessary to support the mission of the outdoor ministry program" noting, for instance, the importance of a wilderness hiking experience to the purposes of the taxpayer. Id. at *3, *4.
In Lebanon Community Foundation, Inc. v. Linn CountyAssessor, TC-MD No 011005A WL 1591920 (July 18, 2002), the court allowed an exemption for 35 acres of property on which the taxpayer, a nonprofit organization with the purpose of "promot[ing] the social, cultural, and economic development of Lebanon and eastern Linn County[,]" planned to create "a regional park."Id. at *1. Actual uses of the property included serving as the site for "the Strawberry Festival, Lebanon's largest annual event" and use upon request by other community nonprofit organizations such as the Elks Lodge. Id. In granting the appeal, the court found that "in this case we have [taxpayer] moving as diligently as it can to create a regional park. It is not surprising that the progress is slower than all would wish. This is a community using a nonprofit entity to provide for themselves what their government cannot provide for them." Id. at *3.
In Christian Meeting Place v. Washington County Assessor
(Christian Meeting Place), TC-MD No 021173C, WL 22119848 at *1 (Sept 2, 2003), the court granted an exemption for a 1.89 acre lot where the residential structure was used for religious purposes but a portion of the remaining lot was unused by the taxpayer. The court noted that "partial exemptions are typically *Page 15 
granted under ORS 307.130 and ORS 307.140 in situations where the land or building(s) are used for a mixture of qualifying and nonqualifying activities." Id. at *3. The court found that:
 "There is no inconsistent use of any portion of [the taxpayer's] property. The disputed portion of the land is simply unused because of the trees, which [the taxpayer] regards as landscaping and which undoubtedly provides a buffer from the adjoining property that appears to be a large commercial operation. Moreover, that land does not readily lend itself to other uses."
Id. The court granted an exemption for the entire parcel, stating "only qualifying activities take place on the property, although admittedly portions of the land may be underutilized."Id. at *4.
In Korean Bethel Presbyterian Church v. Washington CountyAssessor (Korean Bethel), TC-MD No 070015D, WL 80208 (Jan 4, 2008), this court granted a property tax exemption for "a structure surrounded by .16 acres" based on witness testimony describing their personal knowledge of the property's use and identifying four days on which "`volunteer labor was used to prepare the facilities for public worship and church materials storage.'"Id. at *2, *3, *4.
3. Oregon Tax Court Cases — exemption denied
In Perkins, the court determined that "a vacant lot located near the old Gresham Elks Lodge" was not entitled to property tax exemption under ORS 307.136 because the property was listed for sale and "[t]he prior uses qualifying the property for exemption such as the youth soccer club, jogging, and picnicking did not take place."Perkins, 15 OTR at 383, 385.
In Multnomah County v. Dept. of Rev.
(Multnomah County), 13 OTR 339, 340 (1995), this court denied property tax exemption for property described as "four tax lots improved with an old warehouse and a blacktop parking area" owned by a charitable organization that provided mental health services. The charitable organization planned to finance and construct a new facility on the property; "[i]n the meantime, one of the mental health therapists used the property as a vocational training site for entry-level clients enrolled in lawn care and maintenance *Page 16 
programs. He made no use of the building but taught groups of three to five individuals to sweep the driveway, trim trees and shrubs, and pull grass and weeds." Id. That activity occurred "twice in October 1992, and then again in the spring of 1993. The property was used for this activity once every two to three weeks from May or June until October 1993[.]" Id. The court held that use "[in]sufficient to qualify as `actually and exclusively occupied or used'" under ORS 307.130, explaining: "The building and parking lot took up approximately one square block in area. No use was made of the building and no vehicles were parked in the parking area."Id. at 342. The court found the taxpayer's actual use to be "minimal" and "of such a low level it had little relationship to the property. This de minimis use hardly justifies exempting the whole." Id.
C. The subject property
The testimony of Marsh demonstrates that the paved area and another similar sized portion of the subject property was available for free public parking 365 days during the year, satisfying the requirements of ORS 307.136(2). Letters from members of the community support Marsh's testimony that the subject property was available for free public parking and was used for that purpose. (See Ptf's Ex 15.) O'Dell testified that the subject property was used for overflow parking during at least one community event organized, in part, by Plaintiff. The uncontroverted testimony of Marsh, Otto, O'Dell, McGinnis, and Walker, demonstrates that several community events dedicated to cleaning up the subject property and restoring the portion of North Fork of Deep Creek that flows through the property were held in 2009 and 2010; the part of the subject property utilized in those activities was the stream itself along with a 50 foot buffer on each side of the stream except for an area of buffer reduced to 35 feet due to the paved parking area. That same portion of the subject property was used by students from local schools and universities and became a model project for stream restoration for the CRBC in 2010. *Page 17 
Both Marsh and Lutrell testified persuasively that Plaintiff's mission includes community service and involvement as well as environmental stewardship. The court finds that Plaintiff's activities on the subject property are within the purview of Plaintiff's mission and that Plaintiff has provided sufficient evidence that the above-described portions of the subject property were "used in fraternal or lodge work or for entertainment and recreational" as required by ORS 307.136(1). The remaining question is whether the entirety of the subject property is entitled to exemption given that Plaintiff has only established its use of a portion of the subject property.
Several factors weigh in favor of allowing an exemption for the entirety of the subject property. First, the relatively natural state of the unused portions of the subject property relate to the qualifying uses of other portions of the subject property insofar as Plaintiff's uses of the subject property involve restoring riparian habitat and supporting a continuous nature trail through Boring. As stated in Golden Writ, "those portions [of the subject property] not actually used are reasonably necessary to accommodate the actual qualifying uses that occur on the remainder of the parcel." Golden Writ, 300 Or 484. Second, the non-use of parts of the subject property is due, in part, to the natural qualities of the terrain. Third, no inconsistent uses occurred on the subject property. Finally, Plaintiff's progress in preparing the subject property for its ultimate purpose has been relatively slow because Plaintiff is a nonprofit organization and reliant on volunteer labor.
Additionally, the facts presented in this case are distinguishable from prior cases in which property tax exemption was denied. Unlike the property at issue in Perkins, the subject property is not listed for sale and Plaintiff has no plans to list it for sale. Furthermore, qualifying activities occurred on the subject property in 2009 and 2010, and are planned for 2011. The court in *Page 18 Multnomah County declined to exempt the entire property at issue based on the limited use of the driveway and parking area for vocational training, noting that the majority of the property was unused and that the actual uses of the property bore little relationship to the property itself. As discussed above, the activities undertaken by Plaintiff on the subject property relate to the subject property itself; volunteer work parties have been organized to clean up the subject property and improve riparian habitat, the paved area is used for trailhead and event parking, and students use the property for study and observation of the natural environment.
 III. CONCLUSION
A review of the case law interpreting ORS 307.130 and ORS 307.140 reveals that the subject property is entitled to exemption based on the actual uses of the subject property and the relationship between the unused portions of the subject property to actual qualifying uses. Further supporting that conclusion, ORS 307.136 involves a less stringent standard for exemption than ORS 307.130 and ORS 307.140. Accordingly, the subject property is entitled to property tax exemption for the 2010-11 tax year under ORS 307.136. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiffs appeal is granted.
Dated this ___ day of July 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor,1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Magistrate Pro Tempore Allison R.Boomer on July 13, 2011. The Court filed and entered this documenton July 13, 2011.
[1] The National Grange mission statement emphasizes building stronger communities and encouraging individuals "to develop their highest potential." (See Ptf's Ex 2.)
[2] Ptf's Ex 15-A, re: "Riparian Improvements" states that "600 feet of streamside buffer on either side of the North Fork of Deep Creek has been planted with native trees and shrubs, in an effort to shade out non-native Himalayan blackberry and English ivy species. Salmon were seen returning to the area in the fall of 2010."
[3] All references to the Oregon Revised Statutes (ORS) are to 2009. *Page 1